LAW OFFICE OF THOMAS K. BOURKE
Thomas K. Bourke (SBN 56333) | Talltom2@aol.com
601 West Fifth Street, Eighth Floor
Los Angeles, CA 90071-2094
Telephone: (213) 623-1092
Fax: (213) 623-5325

THE LAW OFFICE OF THOMAS C. SEABAUGH
Thomas C. Seabaugh (SBN 272458) | tseabaugh@seabaughfirm.com
601 West Fifth Street, Eighth Floor
Los Angeles, CA 90071
Telephone: (213) 225-5850

*Attorneys for Plaintiffs Dean Raiken and Cheryl Raiken*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEAN RAIKEN, an individual; and CHERYL RAIKEN, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> WELLS FARGO BANK, N.A.; and DOES 1 THROUGH 25; <br> Defendants. | Case No. 3:18-cv-02520-H-BGS <br><br> *Hon. Marilyn L. Huff* <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES** <br><br> 1. Slander of Title <br> 2. Violations of Real Estate Settlement Procedures Act <br> 3. Breach of Contract <br> 4. Fraud <br> 5. Infliction of Emotional Distress <br> 6. Business & Professions Code §§ 17200 and 17500 <br> 7. Financial Abuse <br><br> **JURY TRIAL DEMANDED** |

For their First Amended Complaint, Plaintiffs Dean Raiken and Cheryl Raiken allege:

## JURISDICTION AND VENUE

1.     The relief sought in this complaint is within the jurisdiction of this Court.

2.     This action was filed in California Superior Court as an unlimited civil case and was removed to this court by the Defendant.

3.     Venue is proper in this Court because the events giving rise to this case occurred in the County of San Diego, State of California

## PARTIES

1.     Plaintiff Dean Raiken, an individual, and Cheryl Raiken, an individual (together, "Plaintiffs" or "the Raikens") at all times material to this Complaint, were, and are, husband and wife. They lived in a home at 7687 Marker Road, San Diego, CA 92130. They have been running a catering business together since 1993.

2.     Cheryl Raiken was born on March 12, 1953. In September 2015, she was diagnosed with metastatic breast cancer. Following surgery that November, she could not work full time, had difficulty lifting weight, and could not use her right arm. She began undergoing chemotherapy in December 2015, during which time she encountered difficulty working, experienced nausea and fatigue, and in other respects found it difficult to think clearly and to engage in the activities of daily life. Under California Welfare & Institutions Code § 15610.30, Cheryl Raiken is afforded special protections in light of her physical and mental limitations that restricted her ability to carry out normal activities and to protect her rights.

4.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a corporate

First Amended Complaint for Damages

entity with the capacity to sue and be sued. Specifically, Wells Fargo Bank, National Association is a National Banking Association formed under the laws of the United States, which does business in various states under various names and in various corporate forms. Its principal executive office is located in Sioux Falls, South Dakota. In California, the company does business under the name "Wells Fargo Bank, National Association." Its principal office in the State of California is located in San Francisco.

5.     The true names and roles of Defendants DOES 1 through 25 are unknown to The Raikens and they sue these defendants under these fictitious names. The Raikens allege that these defendants are responsible in some manner for the acts and occurrences alleged within this Complaint. The acts and omissions of Defendants DOES 1 through 25 were a substantial factor in causing the Raikens' damages as each Defendant acted in concert with the others. The names and roles of these defendants shall be added to this Complaint as their identities and roles become known.

6.     Each Defendant was the agent, servant, representative, partner, joint venturer, alter ego, successor-in-interest, and/or employee of each other Defendant.

## COMMON ALLEGATIONS

7.     The Raikens reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully alleged herein.

8.     In or about January 2004, the Raikens obtained a home equity line of credit (HELOC) from Defendant Wells Fargo.

9.     The Raikens made proper and regular payments on this account from 2004 to 2012.

10.     In or about December 2012, the Raikens filed for personal bankruptcy due to a downturn in their family business. Specifically, their

First Amended Complaint for Damages

catering business was forced out of the building where it was leasing space when the building was sold. The Raikens emerged from the bankruptcy in 2013 and resumed making payments.

11.    In November 2013, The Raikens received a notice from Defendant Wells Fargo that a balloon payment on their account would come due on February 20, 2014.

12.    The Raikens were surprised by the balloon payment. When they had originally taken out the loan, they had not applied for a loan with a balloon payment. They felt that it was unfair and predatory on Wells Fargo's part to sneak the balloon payment into the original loan agreement without discussing it with them. They subsequently learned, and they now are informed and believe, that only around 5 percent of home-equity lines involve balloon payments, while 95 percent do not.

13.    The Raikens were unable to pay the balloon payment when it was due, and they dutifully and immediately attempted to reach agents and representatives of Wells Fargo to obtain new financing terms with respect to the payment that was coming due.

14.    While the Raikens were attempting to get in touch with Wells Fargo about the balloon payment, their Raikens' interactions with Wells Fargo can be summed up as total chaos, with numerous different representatives contacting the Raikens and leaving messages. Different representatives of Defendant Wells Fargo told the Plaintiffs different things about the status of their account and the options available to them.

15.    Wells Fargo, despite notices to the contrary, continued to send correspondence and letters to the Raikens' former bankruptcy attorney James Beshears, long after he no longer represented them. While the bankrutpcy was discharged in March 2013, this continued until June 2014 and afterwards.

First Amended Complaint for Damages

16.     The balloon-payment deadline came and went in early 2014.

17.     Importantly, before and after the "balloon payment" came due, the Raikens continued to receive statements from Wells Fargo and continued to make monthly payments. Defendant Wells Fargo accepted these payments without objection, as set forth in a written transaction history generated by Wells Fargo.

18.     As set forth in this transaction history, the Raikens continued to make payments after the "balloon" payment came due in 2014, and Defendant Wells Fargo accepted these payments without objection on a monthly basis all the way until late 2017.

19.     On July 10, 2014, Cheryl Raiken spoke to Andy Carlson in Wells Fargo's bankruptcy department. She pointed to various letters she had received threatening foreclosure and demanding final payment. She argued that the balloon-payment term was predatory and that she had been given a bad loan. Mr. Carlson told her to disregard the letters and that they go out automatically. He said that as long as she was working with a "Home Preservation Specialist" that Wells Fargo will not take action. He recognized that she was making payments on the loan and told her to continue to do so.

20.     The Raikens maintained contact with and made every effort to work with the series of different "Home Preservation Specialists" that were assigned to their case. The Raikens understood that as long as they kept making payments and working with their "Home Preservation Specialist," Wells Fargo would not attempt to avail itself of the surprise "balloon payment" provision of the loan agreement, which had been inserted into the agreement without the Raikens' knowledge. In return, the Raikens would not take any legal action based upon the disputed balloon payment. The Raikens' expectation was that they would go through the "mortgage assistance" process and obtain new terms for paying off the debt.

21.    On a handful of occasions, for no consistent reason and seemingly at random, Defendant Wells Fargo purported to refund a monthly payment after originally accepting the payment. On these occasions, the bank first deposited the checks without objection, but then transmitted new checks to the Raikens in the amount of the deposited checks. While this occurred a handful of times, on every other occasion, Defendant Wells Fargo accepted and deposited the funds without objection, which were reflected on the Raikens' statements of account. As a result of these regular monthly payments by the Raikens, the balance fell from over $70,000 in November 2013 to $53,158.70 as of October 2017.

22.    Based on the chaotic "phone tag" to which the Raikens were subjected from various individuals within Wells Fargo, as well as the random reimbursements of their monthly payments, the Raikens believe that their account was erroneously assigned or classified within Wells Fargo's internal systems. From the Raikens' standpoint, it often appeared to be a case of the right hand not knowing what the left hand was doing.

23.    Between November 2013 and November 2017, while they continued to make payments, the Raikens constantly appealed for Defendant Wells Fargo to offer them terms for financing the "balloon" sum. Wells Fargo's correspondence repeatedly urged the Raikens to contact their "Home Preservation Specialist" because options allegedly existed for them to save their home. The Raikens repeatedly availed themselves of the avenues provided by Wells Fargo to apply for "home preservation" relief or other loan assistance.

24.    As demonstrated by the Raikens' experience, Defendant Wells Fargo's "mortgage assistance" process, including without limitation its "Making Home Affordable Program" and its "Hardest Hit Program," together with its "Home Preservation Teams," are a sham. The federal government

has made billions of dollars available for the purpose of helping homeowners save their homes in states like California where the financial crisis had the biggest impact. But in-between homeowners and these funds is a Kafkaesque and arbitrary system administered by the banks, which in the Raikens' case prevented them from getting any assistance and left the bank free to foreclose.

25.     The Raikens did everything that could have been reasonably expected of them and more. The Raikens' first request for loan modification was initiated in January 2014, or prior to the balloon payment coming due. In April 2014, the Raikens were informed that they did not "meet the requirements of the Principal Forgiveness modification." The second request, initiated in August 2014, was denied on the same grounds in October 2014. The third request, made in July 2015, was arbitrarily denied as incomplete in August 2015, despite the Raikens' diligent efforts to provide all requested information. The fourth request, made in August 2014, was denied on the grounds that it did "not meet the requirements of the Proprietary Step Rate Modification." A fifth request, dated July 2016, was denied in August 2016 on the same grounds. A sixth request, dated July 2017, was denied as incomplete in October 2017.

26.     To meet their statutory obligations, the bank provides various procedures and processes where homeowners can request assistance. Mountains of paperwork are demanded from homeowners, whose applications are denied as "incomplete" for arbitrary reasons. There are constant requests for more documents, and if any requested document is for some reason not provided, this serves as a pretext to delay or deny the request. When applications are purportedly evaluated on the merits, there are no intelligible criteria that are used. The Raikens' requests for assistance were repeatedly denied on the grounds of their supposed inability to pay, even as the bank

First Amended Complaint for Damages

continued to accept without objection monthly payments transmitted by the Raikens that were bringing the balance down.

27.    In one case, for example, Wells Fargo premised its denial of an application on the grounds that Dean Raiken was allegedly uncooperative. But Wells Fargo had never asked to speak to him and had never requested any information from him. This underscores the insincere and arbitrary character of the bank's denials of requests for assistance.

28.    In its letters to the Raikens, Wells Fargo referred to options to keep the home. This language were misleading and false, as the Raikens' experience demonstrates. There were no real options to keep the home.

29.    While the Raikens were not able to pay the balloon sum all at once, they would have been able to pay the sum over time, as evidenced by their consistent monthly payments, which were accepted by Wells Fargo without objection.

30.    On October 30, 2017, Defendant Wells Fargo recorded a "Notice of Default" as to the Raikens' loan. In light of the fact that the bank had been continuously accepting monthly payments without objection from the Raikens after the balloon payment came due in February 2014, this notice was false and fraudulent.

31.    After receiving the Notice of Default, Cheryl Raiken called her assigned Wells Fargo "Home Preservation Specialist," who knew nothing about the attempted foreclosure. This underscored, once again, the Raikens' impression that the right hand did not know what the left hand was doing.

32.    Even after Wells Fargo recorded the notice of default, Wells Fargo mailed the Raikens another statement of their account. The Raikens responded to the statement sending in another payment, just as they had done in the past when they received account statements from Wells Fargo. Just as it had done in the past, Wells Fargo accepted the payment without

objection and deposited the check.

33.   Subsequently, Wells Fargo transmitted a cashier's check to the Raikens in the amount of the payment, which purported to be a refund of the amount that Wells Fargo had accepted.

34.   In April 2014, the Raikens made their first complaint to the Consumer Financial Protection Bureau ("CFPB"), which described the surprise balloon payment, the difficulties they encountered communicating with Wells Fargo, and their frustrations with the arbitrary "mortgage assistance" process. Over the phone, a CFPB case manager told Cheryl Raiken that Wells Fargo had told the CFPB that the case was closed and had been settled with the Raikens.

35.   On November 8, 2017, the Raikens complained to the Consumer Financial Protection Bureau about the notice of default. Writing to the CFPB, Cheryl Raiken stated, in part, "They have acted to file a Notice of Default . . . even though they are accepting monthly payments. . . I have applied numerous times and have asked to amortize the loan over a fixed period . . . We are constantly denied any assistance yet they keep accepting payments." This complaint was forwarded to Wells Fargo, as indicated by Wells Fargo's response of November 9, 2017.

36.   On November 9, 2017, the Raikens complained to Clear Recon Corp, the foreclosure trustee and agent for Wells Fargo. Cheryl Raiken wrote, in part: "I am disputing that this debt is in default . . . I have been making monthly payments on this loan, which they are accepting, and recording, and they are sending me monthly statements recording payments, and forwarding the balance." The response dated November 17, 2017 indicates that Clear Recon Corp communicated with Wells Fargo and "verified" the debt (under the Fair Debt Collection Practices Act). This suggests that this complaint was forwarded to Wells Fargo and that Wells Fargo was informed

First Amended Complaint for Damages

of the nature of the Raikens' concerns.

37.     In January 2018, Cheryl Raiken spoke to Anne Cook and JP Nicolaides at Wells Fargo by phone. Mr. Nicolaides' title is "SVP – Growth Strategies and Initiatives Manager, National Underwriting and Production Risk Management." Ms. Cook's title is "Wells Fargo Home Equity Executive Mortgage Specialist, Customer Care and Recovery Group."

38.     On January 18, 2018, Mrs. Raiken wrote to Mr. Nicolaides: "I hereby request you to provide me with the following documents as part of your inquiry into my HELOC Loan [number] with Wells Fargo. As per our conversations, I understand you are doing research into my complaints, which include improper actions and servicing of the loan. I request that Wells Fargo halt the action of foreclosure during this time of review." This email incorporated a list of documents that Mrs. Raiken was requesting.

39.     On January 25, 2018, Mrs. Raiken wrote a similar email to Ms. Cook following telephone discussions: "As a follow up to our phone conversation, I hereby request you to provide me with the following documents as part of your inquiry into my HELOC Loan [number] with Wells Fargo. As per our conversations, I understand you are doing research into my complaints, which include improper actions and servicing of the loan. I request that Wells Fargo halt the action of foreclosure during this time of review." This email incorporated a list of documents that Mrs. Raiken was requesting.

40.     Despite the Raikens' repeated requests for documents and complaints that Wells Fargo was erroneously foreclosing on their home, Wells Fargo pressed ahead with the foreclosure.

41.     With the threat of foreclosure hanging over the property, the Raikens sold their home in early 2018. Unfortunately, the threat of foreclosure had significantly diminished the sale value and limited the

Raikens' opportunity to hold out for the highest price. In addition, the Raikens were compelled to include furniture and fixtures in the sale price of their house that they would not otherwise have agreed to include, and they incurred additional expenses in connection with moving as a result of having to re-purchase these items. Without prejudice to their right to conduct discovery and elicit testimony and opinions with respect to the diminished sale price, the Raikens estimate the difference as $50,000 or greater.

42.     Throughout the progress of their dealings with Wells Fargo, the Raikens were constantly bullied and harassed. They believed that Wells Fargo was trying to intimidate them into giving up and selling the house.

43.     In 2015 or thereabouts, the Raikens came home from work and discovered a person near their house taking pictures. This person claimed to be performing an appraisal since Wells Fargo was in the process of selling the house. This alarmed the Raikens, who explained to this person that they were making monthly payments and the house was not for sale.

44.     In November or December of 2017, the Raikens were inside the house when they discovered an unknown person perched on their windowsill around four and a half feet off the ground, taking pictures of the inside of the house through a window. When the Raikens went outside to confront this person about this outrageous intrusion of their privacy, the person fled, leaving behind a towel on the ledge. Based on the prior encounter, the Raikens believe that Wells Fargo was responsible for this more recent unwelcome visit.

45.     When the balloon payment became due, as stated above, the Raikens were surprised. They immediately requested their entire loan file to verify that the balloon payment was indeed in the original agreement. Around December 2013, the Raikens were provided with a small *portion* of the original file containing the purported balloon payment. But the original

application containing a statement of their income was withheld.

46.    Around the time of the notice of default in 2017, the Raikens reiterated their demands for their entire original file. They received additional documents around December 2017 following their latest complaint to the Consumer Financial Protection Bureau. Reviewing these documents in early 2018, the Raikens discovered that their income on the original application had been substantially overstated without their knowledge or consent. In other words, not only had a balloon payment term been slipped into the agreement without the Raikens' knowledge, but their income had also been misstated without their knowledge.

47.    Accordingly, the Raikens believe that Wells Fargo was aware all along that the loan was predatory and tainted by fraud in its origination, and that Wells Fargo was insisting on foreclosure in order to try to cover up its prior misconduct. This would explain Wells Fargo's repeated and arbitrary denials of their otherwise reasonable requests for "mortgage assistance." Wells Fargo still has not disclosed the entire original loan file.

48.    Beginning in November 2013, the Raikens suffered extreme emotional distress as a result of Defendants' conduct, including without limitation Wells Fargo's arbitrary and unintelligible denials of the Raikens' requests for refinancing. This emotional distress was multiplied and compounded by the bank's wrongful initiation and prosecution of foreclosure proceedings even though the Raikens were making monthly payments and Wells Fargo was accepting them.

49.    The extreme emotional distress suffered by the Raikens was a factor in the onset and progression of Cheryl Raiken's metastatic breast cancer.

50.    She received her diagnosis after the so-called "balloon payment" came due, and was receiving treatment while she was being subjected to the

proverbial "run-around," harassing phone calls, and the bank's sham "assistance" program.

51.    The time spent dealing with and responding to the bank's wrongful actions above took its toll on the Raikens' family business, reducing their income. Keeping track of all the documents, responding to Wells Fargo's harassing phone calls, and the attendant stress took their attention away from their business and diminished their productivity.

52.    Without prejudice to their right to conduct discovery and elicit testimony and opinions with respect to these losses, the Raikens estimate the losses to their business during the period from 2013 to 2018 as $50,000 or greater for each year.

53.    Instead of living in their dream house, the Raikens are now renting their residence. As a result, the money that they spend each month on rent, instead of translating into equity on a house, is wasted.

54.    The Raikens seek to recover damages from Defendant Wells Fargo based upon the above misconduct.

# FIRST CAUSE OF ACTION
## Slander of Title
## (Against all Defendants)

55.    The Raikens reallege and incorporate by reference the above paragraphs of this Complaint as if fully alleged herein.

56.    Wells Fargo's wrongful notice of default and wrongful foreclosure attempts cast doubt about, clouded, or otherwise interfered with the Raikens' property interests in their house.

57.    Wells Fargo engaged in the above conduct despite the fact that it had been accepting payments from the Raikens on a monthly basis. Wells Fargo either knew that the notice of default and foreclosure proceedings were

based on false assertions of fact, on a predatory loan into which terms had been inserted without the borrower's knowledge, and on a underlying transaction tainted by fraud, or Wells Fargo acted with reckless disregard under these circumstances.

58.    In light of above, the initiation and prosecution of foreclosure proceedings by Wells Fargo were malicious and retaliatory. Based on the circumstances, the Raikens believe Wells Fargo was insisting on foreclosure in order to try to cover up its own misconduct.

59.    Wells Fargo knew or should have recognized that one or more third parties might act in reliance on its conduct, causing financial loss to the Raikens.

60.    The Raikens fully performed on their bargain with Wells Fargo, pursuant to which they had been making monthly payments.

61.    The Raikens did in fact suffer financial loss as a result of Wells Fargo's conduct. Without limitation, their house sold for less than it would have sold had the sale not taken place under the shadow of Wells Fargo's false and malicious notice of default and wrongful foreclosure proceedings.

62.    As a direct and proximate result, the Raikens were damaged in an amount to be proven at trial, including without limitation the lowered sale price of the house, damage to the Raikens' financial security, damage to the Raikens' reputation and credit, and emotional distress. The Raikens have also incurred costs and attorneys' fees.

63.    The conduct of Wells Fargo was a substantial factor in causing the Raikens' harm.

64.    Wells Fargo is guilty of malice, fraud and/or oppression.  Wells Fargo's actions were malicious and done willfully in conscious disregard of the rights of the Raikens in that Wells Fargo's actions were calculated to injure the Raikens and profit at their expense. As such the Raikens are

First Amended Complaint for Damages

1  entitled to recover, in addition to actual damages, punitive damages to
2  punish Wells Fargo and to deter Wells Fargo from engaging in future
3  misconduct.

4

5              **SECOND CAUSE OF ACTION**
6      **Violations of the Real Estate Settlement Procedures Act**
7                    **(Against all Defendants)**

8      65.     The Raikens reallege and incorporates by reference the above
9  paragraphs of this Complaint as if fully alleged herein.

10     66.     The conduct of Wells Fargo violated the Real Estate Settlement
11 Procedures Act ("RESPA").

12     67.     Among its many other provisions, RESPA requires mortgage
13 servicers like Wells Fargo to reasonably respond to notifications by a
14 borrower that the servicer had made an error, as well as to a borrower's
15 requests for information. Basically, a servicer must respond by fixing the
16 error or by concluding that there is no error based on a reasonable
17 investigation and then explaining that conclusion and the basis for it in
18 writing to the borrower.

19     68.     Wells Fargo failed to reasonably investigate in response to the
20 Raikens' legitimate queries and complaints, as set forth above. If Wells Fargo
21 had reasonably investigated, it would have necessarily discovered that it was
22 accepting monthly payments with the right hand, while informing the
23 Raikens with the left hand that the Raikens could not afford to make
24 monthly payments.

25     69.     Further, if it had reasonably investigated, Wells Fargo would
26 necessarily have discovered the underlying loan origination fraud. These
27 failures to reasonably investigate the Raikens' case violate, without
28 limitation, 12 U.S.C. § 2605(e)(2)(B) and 12 C.F.R. § 1024.35(e)(1)(i)(B).

70.    Wells Fargo did not timely, accurately, or adequately inform the Raikens of their status, rights, and options. Further, Wells Fargo failed to reasonably evaluate the Raikens for a loan modification. Wells Fargo failed to give intelligible and credible reasons for denying the Raikens' applications and failed to provide any realistic foreclosure alternatives. Wells Fargo accepted monthly payments that were bringing the balance down over a period of over three years. Seemingly at random, and for no consistent reason, Wells Fargo attempted to return a minority of these payments even after accepting them.

71.    Wells Fargo's failures to reasonably investigate the Raikens' case resulted in its failure to discover and correct its inconsistent and erroneous treatment of the Raikens, in violation of 12 U.S.C. § 2605(e)(2)(A) and 12 C.F.R. § 1024.35(e)(1)(i)(A). If Wells Fargo had discovered and corrected these issues, Wells Fargo would not have foreclosed on the house.

72.    It goes without saying that foreclosing on a house in order to cover up underlying loan-origination fraud does not constitute a reasonable investigation or the correction of an error.

73.    In consequence of the above violations, the Raikens were harmed. They were forced to sell their dream house at a diminished price, and now they are renting their residence.

74.    The Raikens seek all available remedies under RESPA, including actual damages, costs, and attorneys' fees.

### THIRD CAUSE OF ACTION
#### Breach of Contract
#### (Against all Defendants)

75.    The Raikens reallege and incorporate by reference the above paragraphs of this Complaint as if fully alleged herein.

76.     The Raikens and Wells Fargo entered into a contract that was implied in fact. The Raikens bring this claim under Civil Code section 1621, which provides: "An implied contract is one, the existence and terms of which are manifested by conduct."

77.     The Raikens believe and allege that during the three-year period of time during which Wells Fargo was accepting their monthly payments without objection, a course of performance or course of dealing was established between the Raikens and Wells Fargo.

78.     The contract between the Raikens and Wells Fargo was implied by their conduct, by the relationship of the Raikens and Wells Fargo, and by all the circumstances of the case as described above. The conduct of the Raikens and Wells Fargo was intentional and each knew, or had reason to know, that the other party would interpret their conduct as agreement to enter into a contract.

79.     Despite the lack of a formal written contract, there was a clear mutual understanding and obligation based on the parties' conduct. The Raikens were making monthly payments and Wells Fargo was accepting the monthly payments, and those monthly payments were reflected on statements issued by Wells Fargo.

80.     The existence of a contract, course of performance, and/or course of dealing is further supported by the telephone conversation between Cheryl Raiken and Andy Carlson on July 10, 2014, described above.

81.     The Raikens performed all their obligations to Wells Fargo under the implied contract. Specifically, they transmitted their monthly payments and Wells Fargo accepted them without objection for three years. Further, they did not take any action based on the disputed balloon payment. By continuing to send payments even after the Wells Fargo initiated foreclosure proceedings, the Raikens manifested their willingness to continue performing

1  their obligations under the agreement.

2      82.   Wells Fargo breached the implied covenant of good faith and fair

3  dealing that is implicit under every California contract. Wells Fargo

4  prevented the Raikens from obtaining the benefit of the bargain by accepting

5  their monthly payments and at the same time foreclosing on their house.

6      83.   Wells Fargo breached the implied contract in October 2017 by

7  recording a notice of default and commencing foreclosure proceedings.

8      84.   As a direct and proximate result of the breach of contract by Wells

9  Fargo, the Raikens suffered damages.

10

11  **FOURTH CAUSE OF ACTION**

12  **Fraud – Concealment**

13  **(Against all Defendants)**

14      85.   The Raikens reallege and incorporate by reference the above

15  paragraphs of this Complaint as if fully alleged herein.

16      86.   The conduct of Wells Fargo was fraudulent and caused harm to

17  the Raikens.

18      87.   Specifically, without limitation, in issuing its notice of default and

19  prosecuting the foreclosure proceedings, Wells Fargo concealed the fact the

20  Raikens were in fact making monthly payments and Wells Fargo was

21  accepting them.

22      88.   Wells Fargo knew or should have known that had the truth been

23  disclosed, it would not be successful in foreclosing on the Raikens' property.

24      89.   Wells Fargo intended to achieve its wrongful foreclosure in the

25  Raikens' property by concealing these facts.

26      90.   Wells Fargo was aware of these misrepresentations and attempted

27  to profit from them.

28

91.    As a direct and proximate result, the Raikens were damaged in an amount to be proven at trial, including without limitation the lowered sale price of the house, damage to the Raikens' financial security, damage to the Raikens' reputation and credit, and emotional distress. The Raikens have also incurred costs and attorneys' fees.

92.    The conduct of Wells Fargo was a substantial factor in causing harm to the Raikens.

93.    Wells Fargo is guilty of malice, fraud and/or oppression.  Wells Fargo's actions were malicious and done willfully in conscious disregard of the rights of the Raikens in that Wells Fargo's actions were calculated to injure the Raikens and profit at the expense of the Raikens. As such the Raikens  are entitled to recover, in addition to actual damages, punitive damages to punish Wells Fargo and to deter Wells Fargo from engaging in future misconduct.

### FIFTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against all Defendants)

94.    The Raikens reallege and incorporate by reference the above paragraphs of this Complaint as if fully alleged herein.

95.    The conduct of Wells Fargo was outrageous and caused the Raikens to suffer emotional distress.

96.    The outrageousness of Wells Fargo's conduct is compounded by the fact that Ms. Raiken received a cancer diagnosis and was undergoing treatment at the time that Wells Fargo was subjecting the Raikens to their sham "home preservation" procedure and wrongfully threatening the Raikens with the loss of their home. As noted above, the stress of this ordeal played a role in the onset and progression of Cheryl Raiken's metastatic breast cancer.

97.   The Raikens had been making monthly payments, and Wells Fargo was accepting monthly payments, so there was no basis to allege that the Raikens were in default.

98.   The conduct of Wells Fargo in trying to foreclose on a household that was actually making monthly payments is so outrageous and extreme that it exceeds all bounds which is usually tolerated in a civilized community.

99.   Such conduct was undertaken with the specific intent of inflicting emotional distress on the Raikens, such that the Raikens would be so emotionally distressed and debilitated that they would be discouraged from contesting Wells Fargo's efforts to take their home.

100.  Alternatively, Wells Fargo was acting with reckless indifference to the likelihood that the Raikens would suffer extreme emotional distress.

101.  Wells Fargo is guilty of malice, fraud and/or oppression.  Wells Fargo's actions were malicious and done willfully in conscious disregard of the rights of the Raikens in that Wells Fargo's actions were calculated to injure the Raikens and profit at the expense of the Raikens. As such Plaintiff is entitled to recover, in addition to actual damages, punitive damages to punish Wells Fargo and to deter Wells Fargo from engaging in future misconduct.

**SIXTH CAUSE OF ACTION**

**Business & Professions Code §§ 17200 and 17500**

**(Against all Defendants)**

102.  The Raikens reallege and incorporate by reference the above paragraphs of this Complaint as if fully alleged herein.

103.  By virtue of the conduct and statements alleged above, Wells Fargo and Does 1-25 engaged in and conspired to engage in unlawful, unfair, and fraudulent business acts and practices forbidden by Business &

Professions Code §§ 17200 et seq. The Raikens suffered injury through loss of their property and money.

104.  Wells Fargo also violated California's false advertising laws, including the False Advertising Law, Business & Professions Code §§ 17500 et seq., because its conduct involved deceptive, untrue, and misleading advertising, including without limitation with respect to the loan modification and "home preservation" process and the options available.

105.  Wells Fargo's correspondence to the Raikens promised that Wells Fargo was committed to helping them and referred to options to keep their home. A letter transmitted to them as late as October 24, 2017, for example, referred to "options to keep the home" that "may be available to you," which include "reinstatement," "repayment plan," "loan modification," and "settlement."

106.  Under "Repayment Plan," the letter states: "Brings the home equity account current. Outstanding payments are divided into manageable accounts that are added to the monthly home equity payment and spread out over a period of time. By having the outstanding balance on the home equity account divided into manageable accounts, you'll catch up sooner and keep a temporary challenge from having longer-term effects."

107.  Under "Loan Modification," the letter states: "The terms of the original home equity account (like interest rate or number of years allowed for repayment) may be changed, bringing the account up-to-date and making the payments more manageable. By having certain terms of the home equity account modified, the monthly payment may be lowered to an amount more manageable for you."

108.  The letter goes on to state, "Let us help you today . . . Right over the phone we'll determine what option is best to help overcome the home equity payment challenges."

109.   Upon information and belief, similar language was transmitted to other Wells Fargo customers and borrowers.

110.   Despite years of diligent and good faith efforts involving a huge volume of paperwork, and despite actually making regular monthly payments that were accepted by Wells Fargo, the Raikens were unable to avail themselves of any of these supposed options.

111.   Wells Fargo repeatedly failed to provide a complete set of loan documents to the Raikens despite their many requests.

112.   Wells Fargo and its agents, business partners, and co-conspirators and the Doe Defendants violated the following California and federal statutes, and these violations are "borrowed" by the "unlawful" prong of Section 17200:

(a)   18 U.S.C § 1014 (making of false statements in connection with a loan or credit application);

(b)   The common law and California Civil Code §§ 1709 and 1710 (by intentionally defrauding the Plaintiffs and negligently misrepresenting facts to the Plaintiffs);

(c)   Financial abuse under the common law and Civil Code § 3345;

(d)   Financial Code § 50701 (as to the form and content of mortgage-loan agreements with borrowers);

(e)   California's false advertising laws;

(f)   California's self-executing Article 1, Section 1 recognizing inalienable rights of property and privacy; and

(g)   The theft by false pretenses statutes, misappropriation of entrusted property statutes, and Penal Code § 496(c).

113.   The Raikens were injured in fact by Wells Fargo's business acts and practices in violation of §§ 17200 *et seq.*, and they lost money and property as a result of these business acts and practices.

First Amended Complaint for Damages

114.  The Raikens are entitled to equitable relief available under Business & Professions Code §§ 17200, *et seq.*, which is available against any person who engages, or has engaged in unfair competition.

115.  The court may make such orders or judgments as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

116.  The Raikens seek all available relief, including without limitation injunctive relief necessary to restore them to their money, property, fees, interest, and commissions taken by Wells Fargo and Does 1-25 and to enjoin Wells Fargo from failing to comply with borrower requests for their loan records in a timely and complete manner.

## SEVENTH CAUSE OF ACTION
### Financial Abuse of Disabled Adult (Cancer)
### (By Cheryl Raiken Against all Defendants)

117.  Cheryl Raiken realleges and incorporates by reference the above paragraphs of this Complaint as if fully alleged herein.

118.  Cheryl Raiken was born on March 12, 1953. In September 2015, she was diagnosed with metastatic breast cancer.

119.  She underwent surgery in November 2015. Following the surgery, she could not work full time, had difficulty lifting weight, and could not use her right arm.

120.  She began undergoing chemotherapy in December 2015, during which time she encountered difficulty working, experienced nausea and fatigue, and in other respects found it difficult to think clearly and to engage in the activities of daily life.

121.   She received radiation treatment during the summer of 2016. She was undergoing this traumatic and difficult ordeal while Wells Fargo was engaging in the conduct described above. She reported her diagnosis to Wells Fargo's agents and employees on multiple occasions.

122.   California Welfare & Institutions Code § 15610.30 affords special protections to any adult person residing in California who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights.

123.   Following her cancer diagnosis, Wells Fargo and Does 1-25 obtained unfair advantages over Cheryl Raiken, who reposed confidence in Wells Fargo and Does 1-25, and they took grossly oppressive and unfair advantage of Cheryl Raiken.

124.   This conduct included, without limitation, subjecting her to their sham loan-modification and assistance programs, by giving her the proverbial "run-around," and by attempting to foreclose on her house even though she was making payments that Wells Fargo was accepting.

125.   Here Wells Fargo's acts damaged Cheryl Raiken by causing her emotional distress, by aggravating the already difficult health situation she confronted, and by slandering the title she had to her home.

126.   Defendants' wrongful acts violated Civil Code § 3345, which contains among its remedies treble any civil penalty whenever a trier of fact finds the defendant's conduct caused a disabled person to suffer loss or encumbrance of a primary residence or that the person is substantially more vulnerable than other member of the public and actually suffered substantial emotional or economic damages resulting from the defendant's conduct.

127.   The conduct described above happened when Cheryl Raiken was partially disabled by her breast cancer that required chemotherapy in addition to targeted therapy, causing physical limitations in her normal

1   activities.

2       128.  Wells Fargo knew or should have known that its conduct was

3   directed to a disabled person, because Cheryl Raiken repeatedly informed

4   Wells Fargo's agents and employees of her diagnosis and condition, and that

5   her brain was not functioning normally.

6       129.  Upon information and belief, Wells Fargo is a financial-services

7   company with $1.9 trillion in assets in a heavily regulated industry.

8   Accordingly, Cheryl Raiken infers and believes that the conduct alleged

9   above, including the decision to foreclose, was made by or ratified by a

10  supervisor.

11      130.  Specifically, upon information and belief, Anne Cook, an Executive

12  Resolution Specialist, was primarily responsible for the Raikens' loan during

13  the period during which Wells Fargo was attempting to foreclose on the

14  Raikens' house. Upon information and belief, this managing agent approved

15  and ratified the conduct of Wells Fargo during this period.

16      131.  Wells Fargo caused Cheryl Raiken to suffer a loss or encumbrance

17  of a primary residence, including without limitation by slandering her title to

18  her home, as well as losses of resources that would otherwise be used for

19  personal or family care and maintenance.

20      132.  Following her cancer diagnosis, Cheryl Raiken was substantially

21  more vulnerable than other members of the public because of age, poor

22  health, impaired understanding, restricted mobility, and disability. She

23  actually suffered substantial physical, emotional, and economic damage

24  resulting from Wells Fargo's conduct.

25      133.  Defendants' wrongful acts against Cheryl Raiken constituted

26  financial abuse under Welfare & Institutions Code § 15610.30.

27      134.  In addition to compensatory damages and all other remedies

28  otherwise provided by law, Cheryl Raiken also seeks reasonable attorneys'

fees and costs as well as treble damages.

WHEREFORE, The Raikens pray for the following relief:

As to the First Cause of Action:

1.   Compensatory damages, including emotional distress, in an amount to be shown at trial exceeding $200,000;

2.   Prejudgment interest at 10 percent per annum from the date of sale of Plaintiffs' house;

3.   Punitive damages in an amount to be shown at trial;

4.   Costs;

5.   Such other relief as may be warranted or as is just and proper.

As to the Second Cause of Action:

1.   Compensatory damages in an amount to be shown at trial;

2.   Prejudgment interest at 10 percent per annum from the date of sale of Plaintiffs' house;

3.   Costs;

4.   Attorneys' Fees;

5.   Such other relief as may be warranted or as is just and proper.

As to the Third Cause of Action:

1.   Compensatory damages in an amount to be shown at trial;

2.   Prejudgment interest at 10 percent per annum from the date of sale of Plaintiffs' house;

3.   Costs;

4.   Such other relief as may be warranted or as is just and proper.

First Amended Complaint for Damages

<u>As to the Fourth Cause of Action</u>:

    1.    Compensatory damages in an amount to be shown at trial;

    2.    Prejudgment interest at 10 percent per annum from the date of sale of Plaintiffs' house;

    3.    Punitive damages in an amount to be shown at trial;

    4.    Costs;

    5.    Such other relief as may be warranted or as is just and proper.

<u>As to the Fifth Cause of Action</u>:

    1.    Compensatory damages in an amount to be shown at trial;

    2.    Prejudgment interest at 10 percent per annum from the date of sale of Plaintiffs' house;

    3.    Punitive damages in an amount to be shown at trial;

    4.    Costs;

    5.    Such other relief as may be warranted or as is just and proper.

<u>As to the Sixth Cause of Action</u>:

    1.    All available equitable relief, including without limitation disgorgement and restitution;

    2.    Injunctive relief, including to enjoin Wells Fargo from failing to comply with borrower requests for their loan records in a timely and complete manner;

    3.    Such other relief as may be warranted or as is just and proper;

First Amended Complaint for Damages

As to the Seventh Cause of Action:

1.  Compensatory damages in an amount to be shown at trial;

2.  Treble damages;

3.  Prejudgment interest at 10 percent per annum from the date of sale of Plaintiffs' house;

4.  Costs;

5.  Attorneys' Fees;

6.  Such other relief as may be warranted or as is just and proper.

Dated: December 7, 2018     LAW OFFICE OF THOMAS K. BOURKE

LAW OFFICE OF THOMAS C. SEABAUGH


By:   *s/ Thomas C. Seabaugh*
Thomas K. Bourke
Thomas C. Seabaugh
Attorneys for Plaintiffs
Dean Raiken and Cheryl Raiken

First Amended Complaint for Damages

1

## JURY DEMAND

2

3
The Raikens demand trial by jury on all claims so properly triable.

4
Dated: December 7, 2018     LAW OFFICE OF THOMAS K. BOURKE

5
LAW OFFICE OF THOMAS C. SEABAUGH

6

7

8
By:   *s/ Thomas C. Seabaugh*

9
Thomas K. Bourke

10
Thomas C. Seabaugh

11
Attorneys for Plaintiffs
Dean Raiken and Cheryl Raiken

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint for Damages